**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FISHER/UNITECH, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 13 C 02090 |
| v. | ) |
| | ) Judge John J. Tharp, Jr. |
| COMPUTER AIDED TECHNOLOGY, | ) |
| INC., RODGER P. REAUME, and | ) |
| RICHARD WERNETH, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Since January 1, 2013, plaintiff Fisher/Unitech and defendant Computer Aided Technology, Inc. ("CATI") have been competing resellers of design software and three-dimensional printing equipment manufactured by Stratasys. This case arises from defendant Rodger Reaume's resignation from his sales position at Fisher/Unitech and his subsequent employment with CATI in a similar role. Fisher/Unitech sued Reaume, CATI, and its president Richard Werneth, primarily alleging the misappropriation of trade secrets and breach of Reaume's employment agreement, including a non-compete provision that purports to bar him from working for any Fisher/Unitech competitor in any capacity anywhere within 200 miles of a Fisher/Unitech office or territory. On March 22, the Court entered a temporary restraining order prohibiting the dissemination and use of Fisher/Unitech's confidential information and restricting Reaume from selling or assisting CATI in selling 3-D printing technology in his former Fisher/Unitech territory or to any customer or potential customer with whom Reaume had contact while employed by Fisher/Unitech. TRO, Dkt. # 13 (Mar. 22, 2013). The parties returned

for a preliminary injunction hearing on April 3 and 5, 2013, and the TRO has been extended pending this ruling by agreement of the parties and for good cause shown.

The parties stipulated to convert the TRO into a preliminary injunction insofar as it relates to Fisher/Unitech's confidential information. The Court agrees that preliminary injunctive relief in this regard is warranted; Fisher/Unitech has presented substantial evidence that Reaume appropriated a large volume of documents from Fisher/Unitech that he transferred to his CATI-issued laptop computer and, in some cases, shared via email with CATI both before and after his employment with Fisher/Unitech ended. The parties are working cooperatively to preserve and forensically analyze the relevant computer systems and investigate the extent of any misappropriation, and they agree that Reaume, Werneth, and CATI cannot use any confidential information obtained from Fisher/Unitech or make contact with any customers about whom Reaume possessed confidential information. That leaves only the non-compete provision of Reaume's employment contract for the Court to address.

## FACTS[1]

Reaume signed an employment agreement with Fisher/Unitech on September 10, 2010, and for the next year and a half, he worked for Fisher/Unitech as a Rapid Technology Business Manager—a salesman. In that position, he primarily sold high-end Fortus brand 3-D printers, made by Stratasys, Inc. (now Stratsys Ltd.). Stratasys is described by the parties as the market leader in 3-D printing technology, particularly with respect to equipment capable of direct digital manufacturing (DDM), which produce not only 3-D prototypes but also durable end-use parts.

---

[1] These facts are based on the parties' pleadings, the affidavits and other materials submitted with those pleadings, and the evidence presented during the preliminary injunction hearing. As such, they are necessarily preliminary and remain subject to modification after the parties have fully litigated these issues on the merits. However, consistent with Fed. R. Civ. P. 65(a)(2), any evidence that was received on the motion and that would be admissible at trial is part of the trial record and need not be repeated at trial.

Fisher/Unitech was formerly one of 10 to 12 "level one" resellers authorized by Stratasys to sell its highest end production-grade printers, and it was the only such reseller in the territory comprising Kansas, Missouri, Illinois, Wisconsin, Michigan, Indiana, Ohio, and Kentucky.

Effective January 1, 2013, Stratasys, Inc. merged with another manufacturer of 3-D printers, Objet Ltd. The new company, named Stratasys Ltd., now sells Objet equipment in addition to Stratasys's three lines of printers: the Idea series, the Design series, and the Production series, which includes the high-end Fortus printers that Reaume primarily sold. CATI was a reseller of Objet printers before the merger. CATI had no experience selling the Stratasys equipment, and Fisher/Unitech lacked experience with the Objet line. Since the merger, both CATI and Fisher/Unitech, among other resellers, now sell both Objet and Stratasys equipment, and neither has the exclusivity arrangements they enjoyed before the merger.

As the resellers dealt with the effects of the Stratasys-Objet merger, Werneth recruited Reaume to join CATI. Reaume accepted a position on February 21, 2012, and he quit his job at Fisher/Unitech on March 7, 2013. In the meantime, he appropriated documents from Fisher/Unitech by emailing them to his personal email account or storing them on a portable thumb drive. He subsequently transferred some or all of that information to his CATI-issued laptop computer when he began working there. Reaume also emailed documents to CATI while he was still working for Fisher/Unitech; for instance, on February 27, 2013, he sent CATI's president, Richard Werneth, samples of price quotes for product bundles that Werneth had inquired about. As previously noted, these activities are the basis of many of Fisher/Unitech's claims and will be the subject of continuing injunctive relief until the claims are resolved on their merits.

In addition to imposing confidentiality requirements, Reaume's employment agreement with Fisher/Unitech contained the following clause:

> NON-COMPETE AGREEMENT: Recognizing that various items of Information are special and unique assets of the company, Employee agrees and covenants that for a period of 2 years following the termination of this Agreement, whether such termination is voluntary or involuntary, Employee will not directly or indirectly engage in any business competitive with Employer. This covenant shall apply to the geographical area that includes the area within a 200 mile radius of any Fisher/Unitech Inc. office or territory. Directly or indirectly engaging in any competitive business includes, but is not limited to, (1) engaging in a business as owner, partner, or agent, (ii) becoming an employee of any third party that is engaged in such business, (iii) becoming interested directly or indirectly in any such business, or (iv) soliciting any customer of Employer for the benefit of a third party that is engaged in such business.

The parties do not dispute that CATI is a competitive business with respect to Fisher/Unitech, nor that Reaume's employment with CATI would violate the non-compete clause if enforced according to its terms.

## DISCUSSION

To obtain a preliminary injunction, Fisher/Unitech must establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). In addressing these factors the Court considers only the claim that Reaume breached the employment agreement's non-compete provision; as noted, the parties have stipulated to the entry of a preliminary injunction with respect to use of any confidential information Reaume took from Fisher/Unitech. The first question, then, is whether Fisher/Unitech is likely to succeed on its breach of contract claim as to the non-compete clause; this question turns not on whether a breach occurred—it did—but on whether the non-compete provision is enforceable to begin with.

The parties dispute whether the employment provision in this case should be governed by Illinois or Michigan law, but save for one issue discussed further below, the parties have identified, and the Court has discerned, no material difference between the law of either state with respect to the requirements of a valid non-compete provision. Both Illinois and Michigan allow the use of restrictive covenants, including non-compete provisions, in employment agreements, to the extent they are reasonable. *Reliable Fire Equipment Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011); *St. Clair Medical, P.C. v. Borgiel*, 715 N.W.2d 914, 918-19 (Mich. Ct. App. 2006). In Illinois, the validity of non-compete provisions is governed by common law. *See Reliable Fire Equip. Co.*, 965 N.E. 2d at 397. Michigan law is statutory, but it is widely held that the statute was simply a codification of existing common law. *See* M.C.L.A. 445.774a(1); *St. Clair Medical, P.C.* 715 N.W.2d at 918-19; *Bristol Window and Door, Inc. v. Hoogenstyn*, 650 N.W.2d 670, 679 (Mich. Ct. App. 2002).

As a component of reasonableness, both states require that a non-compete provision protect a legitimate business interest of the employer. Under Illinois law, whether the employer has a legitimate interest depends on the totality of the circumstances, including non-exclusive factors such as "the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Reliable Fire Equip. Co*., 965 N.E. 2d at 403. Similarly, under Michigan law, the "reasonableness of a covenant not to compete is not analyzed in the abstract, but in the context of the employer's particular business interest and the function and knowledge of the particular employee." *Whirlpool Corp. v. Burns*, 457 F. Supp. 2d 806, 812 (W.D. Mich. 2006) (applying Michigan law).

In this case, Fisher/Unitech argues that the noncompete provision is necessary to enforce its legitimate business interest in protecting its confidential information. According to Fisher/Unitech, CATI will gain an unfair competitive advantage if Reaume is permitted to work for CATI in territory where the two companies compete because he will inevitably rely on confidential information he acquired from Fisher/Unitech. CATI, on the other hand, contends that the existing injunction adequately protects Fisher/Unitech's confidential information, and therefore, any further restriction on Reaume's business activity is a straightforward limitation of competition. According to CATI, the non-compete clause goes beyond protecting confidential information to unfairly restrict Reaume from applying his general knowledge and experience in the field of selling high-end 3-D printing technology.

There is no question that protecting confidential operational and customer information is a legitimate, protectable business interest of an employer. *See Lifetec, Inc. v. Edwards*, 880 N.E.2d 188, 200 (Ill. App. Ct. 2007); *St. Clair Medical, P.C.,* 715 N.W. 2d at 918-19. Equally well-established, however, is the principle that merely preventing competition is not a legitimate business interest that justifies a restrictive covenant. *St. Clair Medical, P.C*., 715 N.W. 2d at 919. "To be reasonable in relation to an employer's competitive business interest, a restrictive covenant must protect against the employee's gaining some unfair advantage in competition with the employer, but not prohibit the employee from using general knowledge or skill." *Id*. at 919; *see Delta Medical Systems v. Mid-America Medical Systems, Inc*., 772 N.E.2d 768, 780 (Ill. App. Ct. 2002) ("[I]n a competitive market, an employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his chosen occupation").

Fisher/Unitech's legitimate interest in protecting its confidential information, including but not limited to actual trade secrets, is clearly implicated in this case. However, Fisher/Unitech

has already secured agreed injunctive relief to protect that interest and which is premised not only on the confidentiality provisions of Reaume's employment agreement with Fisher/Unitech but on the related trade-secrets and other claims as to which Fisher/Unitech demonstrated a likelihood of success on the merits. Specifically, the injunction provides:

> A. Defendants Computer Aided Technology, Inc., ("CATI"), Rodger P. Reaume, and Richard Werneth, their agents, servants, employees, officers, attorneys, successors and assigns, and all persons, firms, and corporations acting in connection or participation with them or on their behalf, are enjoined from using, referencing, evaluating, relying on, transmitting or copying in any direct or indirect manner any Confidential Information of Fisher/Unitech. For purposes of this order, "Confidential Information" consists of any information regarding Fisher/Unitech's customers, prospects, leads, services, quotes, pricing, margins, inventions, product design, product bundles, or training contained in e-mails or other documents that Defendant Reaume emailed to his Yahoo.com e-mail account, transferred to a portable device, transmitted or communicated to any employee or representative of CATI, or otherwise obtained from Fisher/Unitech, or that Reaume developed or obtained on Fisher/Unitech's behalf.
> 
> \*\*\*
> 
> C. Defendant Rodger P. Reaume is enjoined from directly or indirectly contacting, soliciting, or transacting business with any customer or potential customer with whom he had any contact, or as to whom he otherwise possessed Confidential Information, during the last two years of his employment with Fisher/Unitech. Defendant Reaume is further enjoined from aiding or assisting Defendant CATI in contacting, soliciting, or transacting business with any such customer or potential customer. Further, Defendant CATI is enjoined from further soliciting or pursuing any potential sale(s) Reaume is enjoined from pursuing under this Order to the extent that Defendant Reaume previously used, disclosed, or provided Fisher/Unitech Confidential Information in the course of aiding or assisting CATI in soliciting or pursuing the potential sale(s).

Thus, the injunction secures Fisher/Unitech's confidential information and inhibits Reaume and CATI from contacting any customers or prospects that Reaume had dealings with or possessed any confidential information about. Given that its confidential information is already protected by statute, contract, and the preliminary injunction already agreed to by the parties, enforcement of the non-compete provision of Reaume's employment agreement, then, appears to be unnecessary.

Fisher/Unitech argues, however, that these restrictions "are not sufficient in and of themselves to protect Fisher/Unitech from other misuse of its confidential information by Defendants." Invoking the doctrine of inevitable disclosure, see *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995), Fisher/Unitech posits that there is some subset of its confidential information that Reaume has absorbed and necessarily will bring to bear in his work for CATI, whether consciously and deliberately or despite his best efforts. Fisher/Unitech refers to this subset of information as its "best practices" or "know-how" that it developed for selling Stratasys DDM printers, largely through trial and error. Because that knowledge inevitably will be disclosed in the normal course of Reaume's work, Fisher/Unitech contends, Reaume cannot be permitted to perform that work at all on behalf on Fisher/Unitech's competitor.

In *Pepsico*, the Seventh Circuit upheld the district court's application of the inevitable disclosure doctrine as a basis for enjoining a former Pepsico executive from assuming a position at a competitor in addition to enjoining the disclosure of trade secrets and confidential information. 54 F.3d at 1265-66. There, defendant had decamped to Quaker, a competitor of Pepsico's in the sports drink market, with deep knowledge of sensitive information including (1) Pepsico's strategic plan; (2) its operating plan, including the "pricing architecture" for products; (3) its "attack plans" for specific markets; and (4) knowledge of its selling and delivery systems. The district court concluded that "unless Redmond possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about Gatorade and Snapple by relying on his knowledge of [Pepsico's] trade secrets." *Id*. at 1269. Therefore, even without actual misappropriation, an injunction was appropriate.

Fisher/Unitech argues that the sales techniques and best practices that Reaume learned exclusively through working at Fisher/Unitech, like the strategic information known to the

defendant in *Pepsico*, require precluding him from competing with his former employer lest he inevitably disclose the secret information in the course of his work. According to Fisher/Unitech's CEO and president, Charles Hess, Reaume was in possession of three kinds of confidential information that required barring him from the sale of Stratasys 3-D printers for CATI: (1) "the visualization and identification of an application that would be suitable for DDM in the first place"' (2) "applying the equipment in a technical sense" and "figuring out how to make this equipment work for manufacturing"; and (3) "how to do a return on investment and how to include DDM as a portion of the overall ROI picture that ultimately convinces the [customer] to invest the company's funds into this technology." According to Fisher/Unitech, these three main areas of expertise were uniquely within its knowledge because it was an exclusive reseller of the equipment from 2009 through 2012 and had to develop appropriate techniques through trial and error.

This case is quite different from *Pepsico*. With due respect to Fisher/Unitech for its innovations in marketing an emerging technology,[2] the "confidential" and "unique" skills it trumpets are the very definition of the general knowledge and experience that cannot be protected with non-compete restrictions. *See St. Clair Medical, P.C.*, 715 N.W. 2d at 919; *Delta Med. Systems*, 772 N.E.2d at 780. Fisher/Unitech peppers its briefs with references to "best practices," "know-how," and "intangible knowledge" including "processes" and "techniques" that need protecting. But when its witnesses were called upon to put evidentiary meat on these rhetorical bones, they described nothing more than general knowledge and experience that any Stratasys reseller would likely develop through "on the job training" and "trial and error"—the

---

[2] According to the record, although 3-D printing has existed in some form for decades, DDM is a cutting-edge, industry-changing development. However, Fisher/Unitech's confidential information, which pertains to potential applications for particular customers, should not be confused with the manufacturer's proprietary technology.

purported sources of Fisher/Unitech's supposedly unique and proprietary sales practices. For instance, Fisher/Unitech pointed to Reaume's knowledge of Fisher/Unitech's successes or failures in developing and marketing particular applications of DDM technology—knowledge obtained through painstaking trial and error that CATI, unfairly, would not have to replicate. But "legwork" is not confidential information, nor is one firm entitled to protection because it was the first to develop certain knowledge. *See Southwest Whey, Inc. v. Nutrition 101, Inc.*, 117 F.Supp.2d 770, 777 (C.D. Ill. 2000).

Fisher/Unitech's witnesses repeatedly emphasized that Reaume had acquired certain "skills" by virtue of working for Fisher/Unitech. But Hess also conceded that those skills were "something that every sales rep who sells DDM technology needs to know about in order to sell the product." Similarly, Hess initially stated that no one would have these skills without working at Fisher/Unitech, but he ultimately conceded that similar on-the-job experience would have been available at the dozen other level-one Stratasys dealers. *See Unisource Worldwide, Inc. v. Carrara*, 244 F.Supp.2d 977, 988 (C.D. Ill. 2003) ("Unisource does not allege that it has any secret methods or processes for selling products that differ from the methods and processes of its competitors."). Indeed, with respect to all three types of purportedly confidential information he identified, Hess testified that the unique knowledge came simply from doing the job. First, the "visualization" of new applications for DDM—finding customers—is a skill learned through on-the-job training. Second, an understanding of the technology and how to use it meet a particular customer's needs was also acquired through experience, and would be needed by anyone selling DDM technology. Third, preparing a credible return on investment analysis—closing the deal— was the product of experience. Skills learned through employment are "exactly the generalized knowledge and expertise" that are "not subject to restriction." *See Capsonic Group v. Swick*, 537

N.E.2d 1378 (Ill. App. Ct. 1989) (rejecting trade-secret protection where the plaintiff-employer argued that during the employee's tenure, "he learned how to choose a particular standard component and combine it with other components to construct an automated production process—a skill that, but for his employment with [plaintiff], [he]would not possess.").

Moreover, the evidence suggests that much of what Fisher/Unitech considers proprietary information is built upon a foundation of knowledge and resources that come from the manufacturer, Stratasys. Stratasys provides the resellers of its Fortus brand printers with comprehensive, multi-day training about the technology and about identifying possible applications and, therefore, potential customers. It provides ongoing sales and technical support. Resellers can even outsource the production of sample parts for prospective customers to Stratsys for printing—and, in the process, share with Stratasys the same process of trial and error over which Fisher/Unitech claims exclusivity. The evidence suggests that Stratasys, not its resellers, ultimately directs and controls much of the technology training and pricing of its machines. When asked if Reaume has acquired any skills from Fisher/Unitech that were distinct from what he had learned through his Stratasys training, Hess again replied that Reaume got "field experience" and "on the job training."

By consistently returning to this refrain, Fisher/Unitech fails to establish that the information it seeks to protect from inevitable disclosure is anything but general skills and information gained from experience selling 3-D printing technology in the manufacturing sector. This is contrast to *Pepsico*, where the defendant "possessed extensive and intimate knowledge about [Pepsico's] strategic goals for 1995 in sports drinks and new age drinks"—the same arena in which he would working at competitor Quaker. *See* 54 F.3d at 1269. And even in that case, the appellate court noted that the strategic information was not a "traditional" trade secret. Here,

Fisher/Unitech's consistent references to "trial and error" and "on the job training" as the foundation for its claims of confidentiality distinguish its interests from the discrete strategic or proprietary information that the defendant in *Pepsico* possessed. Knowledge and skills acquired through on-the-job training are not protectable with restrictive covenants, even when that training is extensive and costly to the employer. *See Ram Products Co., Inc. v. Chauncey*, 967 F.Supp. 1071, 1092 (N.D. Ind. 1997) (applying Michigan law); *American Hardware Mut. Ins. Co. v. Moran*, 545 F. Supp. 192, 198 (N.D. Ill.) (applying Illinois law) ("[A]n employee cannot be forced to erase from his mind all the knowledge and skills that he acquired during prior employment. . . . American Hardware has failed to demonstrate any information communicated during the training process was of a confidential or secret nature.").

Fisher/Unitech also points to Reaume's evident intent to use Fisher/Unitech's confidential information while employed at CATI as further reason to strictly enforce his non-compete agreement. For this proposition it again relies on *Pepsico*, in which the plaintiff demonstrated the need for an injunction in part because the defendants' actions "demonstrated a lack of candor on their part and proof of their willingness to misuse PCNA trade secrets." 54 F.3d at 1270. Fisher/Unitech's argument is somewhat inapt; in *Pepsico*, the defendant's dishonest conduct was a factor in the court's determination that the trade-secrets claim was likely to succeed on the merits. Here, the general information and experience that Fisher/Unitech wants to keep confidential through a non-compete provision is not a trade secret or otherwise protectable.

Still, as a general rule, courts sitting in equity have discretion to enter broad injunctions, even against lawful conduct, where a proclivity for unlawful conduct has been shown. *See Russian Media Group, LLC v. Cable America, Inc.*, 598 F.3d 302, 307 (7th Cir. 2010). And

based on the evidence presented to date, the Court shares Fisher/Unitech's concerns about Mr. Reaume's lack of respect for his obligation to safeguard its confidential information are not unfounded. But, a non-compete clause is not equity's answer to punitive damages. Mr. Reaume's inappropriate conduct with respect to Fisher/Unitech's confidential information has been, and will be, enjoined, and it might entitle Fisher/Unitech to collect money damages once this case is heard on the merits. Further restrictions on Mr. Reaume's ability to earn a living in his chosen profession, however, are not warranted by the concerns Fisher/Unitech has put on the record in these proceedings to date.

That is particularly true in light of the sheer overbreadth of the non-compete clause as drafted. Rendering the clause reasonable would require not merely shaving down the scope but rewriting the provision, something that both Illinois and Michigan law (which is somewhat more liberal with modification) discourages. *See Your Home Town USA, Inc. v. Creative Graphics, Inc.*, 2007 WL 778569, at *4 (Mich. Ct. App. 2007); *Arcor, Inc. v. Haas*, 842 N.E.2d 265, 274 (Ill. App. Ct. 2005). First, the geographic scope of Fisher/Unitech's non-compete clause is clearly overbroad. In evaluating the reasonableness of a non-compete provision's scope, "courts generally look to whether the restricted area is coextensive with the area in which the employer is doing business" because "the employee should only be excluded from doing business in the territorial zone in which relationships with the employer's customers could have been established in ways that could be detrimental in the hands of a competitor." *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 879 N.E. 2d 512, 523 (Ill. App. Ct. 2007). Although even provisions without any geographic limits have been upheld where the plaintiff is a truly national or international business, in every case "competition agreements must be tailored so that the

scope of the agreement is no greater than is reasonably necessary to protect the employer's legitimate business interests." *Whirlpool Corp.* 457 F. Supp.2d at 813.

There is no evidence of tailoring in this non-compete provision. Reaume's Fisher/Unitech territory included Illinois, Wisconsin and northwest Indiana, yet the non-compete clause bars him from employment for a competitor anywhere within 200 miles of *any* Fisher/Unitech office *or territory*. As the defendants rightly point out, this effectively places a 200-mile cushion around Fisher/Unitech's selling areas, encompassing New England and states in the Midwest where Reaume had absolutely no customer contact. The only possible goal of such an extensive restriction is to let Fisher/Unitech expand its territory outward another 200 miles in every direction before having to face any competition from Reaume. Fisher/Unitech's counsel argued at the hearing that Iowa and Minnesota would still be open to Reaume, because Fisher/Unitech is not authorized to sell there, but that argument is not accurate—bordering Illinois on the west and at approximately 300 miles wide, some two-thirds of Iowa would fall within the boundaries claimed by Fisher/Unitech, for example. Even if it were, it would serve only to underscore Fisher/Unitech's goal of preventing competition within its existing territory. There is nothing in the record that connects the scope of the restraint to Fisher/Unitech's need to protect confidential information, which is the only justification it has offered for imposing the non-compete clause.

Second, the non-compete provision also is impermissibly broad as to the activities it precludes. Reaume is forbidden from "becoming an employee" of any business that competes with Fisher/Unitech. Surely such a broad restriction is not tailored to the need to protect confidential information—again, the only justification Fisher/Unitech has offered for the non-compete clause. Under both Michigan and Illinois law, restrictions on working for the plaintiff's competitors in any capacity are viewed with great suspicion. *See Cambridge Engineering, Inc.*,

879 N.E.2d at 526 ("blanket bar on all activities for competitors" is "blatant overbreadth" which "goes far beyond the standard for acceptable activity restrictions"); *Superior Consulting Co., Inc. v. Walling*, 851 F.Supp. 839, 847 (E.D. Mich. 1994) ("A limitation on working in any capacity for a competitor of a former employer is too broad to be enforceable.") In closing arguments, Fisher/Unitech's counsel suggested that Reaume could sell SolidWorks—the computer-aided design software used by many of the parties' manufacturing customers—or do anything other than sell 3-D printers. But that is true only if the terms of the non-compete that Fisher/Unitech actually imposed in the contract are drastically curtailed. Although it has purported to defend the non-compete provision as drafted, Fisher/Unitech clearly assumes some amount of modification will be required to tailor its scope to the interest it is asserting.

The parties' sole disagreement about the law that governs the non-compete provision centers on when Illinois, like Michigan, permits courts to modify overly broad non-compete provisions to bring them within tolerable limits.[3] It is not necessary to resolve that dispute in view of the Court's holding that Reaume will not "inevitably" disclose any information as to which Fisher/Unitech has a protectable interest, but even if it were, the result would not change. Given the substantial overbreadth of the non-compete provision, whether it chose Michigan or

---

[3] As noted, the defendants argue that the Michigan choice-of-law provision in the contract should be disregarded because Michigan law allowing modification of non-compete provisions violates a fundamental Illinois public policy against modification, premised on the view that employers should not be encouraged "to stake out unrealistic boundaries in time and space" by permitting judicial reformation of overbroad agreements, which insulates them from the potential invalidation of overbroad agreements. *See House of Vision, Inc. v. Hiyane*, 37 Ill. 2d 32, 39 (1967). But Illinois law plainly does allow courts the discretion to modify some overbroad non-compete provisions, *see id.* ("we do not hold that a court of equity may never modify the restraints" [but] "the fairness of the restraint . . . is a relevant consideration"), and Michigan law does not *require* modification, *see* M.C.L.A. 445.774a(1)("a court *may* limit the agreement to render it reasonable"), so in the Court's view, the defendants overstate any conflict between Illinois and Michigan law.

Illinois law, the Court would not exercise its discretion to rewrite the provision to Fisher/Unitech's benefit .

\* \* \*

Having concluded that Fisher/Unitech failed to establish that it has a legitimate business interest in imposing restrictions on Reaume's activities beyond those directed specifically at the protection of confidential information, the court need not consider modifying the non-compete provision as to its geographic scope or its covered activities. Without a protectable interest at stake beyond what has been addressed by the agreed injunction, there is no justification for any non-compete provision. Therefore, Fisher/Unitech has not shown a likelihood of success on the merits, or any irreparable harm that will result from Reaume maintaining his employment as limited by the agreed injunction. Accordingly, the Court denies the motion for preliminary injunction to the extent it seeks enforcement of the non-compete clause it is original or any modified form. Furthermore, the directive in paragraph 2B of the TRO shall expire upon this issuance of this order.

The TRO's provisions pertaining to the protection of confidential information—paragraphs 2A, 2C, 3, 4, and 5—shall be converted into a preliminary injunction because they are needed to protect against the risk of irreparable harm to Fisher/Unitech and there is a reasonable likelihood that Fisher/Unitech will prevail on the merits of its claims relating to its trade secrets and other confidential information.

Entered: April 9, 2013

John J. Tharp, Jr.
United States District Judge